UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JONATHAN D. KING,                          )
                                           )
                    Plaintiff,             )
                                           )
          v.                               )          No. 1:18-cv-03524-SEB-MPB
                                           )
CITY OF FISHERS,                           )
TROY FETTINGER,                            )
KYLE MCFERRAN,                             )
ERIC FREEMAN,                              )
EDWARD GEBHART,                            )
MITCHELL S. THOMPSON,                      )
                                           )
                    Defendants.            )

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

On November 13, 2018, Plaintiff Jonathan D. King *pro se* initiated this civil rights

lawsuit against the City of Fishers, Indianapolis ("Fishers") and several of its police

officers (collectively "Defendants" unless context requires otherwise). On May 15, 2019,

the Magistrate Judge granted Mr. King's motion to file a second amended complaint in

which Mr. King alleges that Defendants violated his rights under the Fourth and

Fourteenth Amendments to the United States Constitution. [Dkt. 28]. Now before the

Court is Defendants' Motion for Summary Judgment.[1] [Dkt. 47]. For the reasons set forth

herein, Defendants' motion is granted in part and denied in part.

---

[1] Defendants complied with the *pro se* notice requirements set out in our Local Rule 56-1(k).
[Dkt. 50].

## **Preliminary Disputes**

Throughout the briefing on this motion, both parties have filed motions to strike directed at evidence or portions of briefing submitted by the other side. The Magistrate Judge denied each of these motions on various grounds. As he reminded the parties, our Local Rule 56-1(i) provides that issues related to the admissibility of evidence should not be raised via collateral motions, but instead in the context of summary judgment briefing. [Dkt 72, at 9; Dkt 82, at 2].[2] To the extent challenges to the admissibility of evidence have, in fact, been properly raised in the parties' summary judgment briefing, we address them below.

The Court, however,  cannot ignore obvious deficiencies in the evidence, particularly in Mr. King's evidence as the respondent to the summary judgment motion. Though Mr. King is proceeding *pro se*, he was notified that in responding he must "support each fact [] asserted, and each factual disputed raised [], with citations to admissible evidence in the record[.]" *Smith v. Adams*, 804 Fed. Appx. 390, 391 (7th Cir. 2020) (confirming that district courts may require *pro se* litigants to strictly comply with local rules regarding summary judgment briefing when they have been sufficiently warned of their duties). While we shall accord him the benefit of construing his briefing liberally, we cannot in doing so consider evidence that would clearly be inadmissible at trial.

---

[2] On August 14, 2020,  we overruled Mr. King's objections to the Magistrate Judge's Order. [Dkt. 92].

2

For example, we cannot credit statements in affidavits that plainly are not based on personal knowledge. Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge[.]'").  In that same vein, we cannot accept as fact statements in affidavits reflecting a party's own speculations, legal conclusions, or arguments. *Murry v. Barnes*, 122 Fed. Appx. 853, 855 (7th Cir. 2004) (reiterating that "statements outside the affiant's personal knowledge or statements that are the result of speculation or conjecture or merely conclusory" do not meet the requirements of Rule 56).

Nor can the court consider evidence not actually before us. For example, portions of Mr. King's affidavits describe what he alleges he heard on a police recording that was produced in discovery. This recording, either in original form or a copy thereof, has not been submitted as evidence. Thus, we cannot accept as true and accurate Mr. King's recapitulations of the statements allegedly made on the recordings. *Smith*, 805. Fed. App'x at 391-92 (affirming district court's exclusion of *pro se* plaintiff's references to video footage and 911 recordings when he failed to submit them to the court).

One final procedural matter: Mr. King has filed a surreply brief. Per our Local Rule 56-1(d), "A party opposing a summary judgment motion may file a surreply brief only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response." To the extent Mr. King's surreply addresses evidence raised for the first time in Defendants' reply brief or responds to Defendants' objections to the admissibility of evidence cited in Mr. King's response brief, it can and will be

considered by the Court. We shall disregard, however, this Surreply to the extent it merely reiterates arguments previously raised in Mr. King's response brief.

### Background

The following facts are undisputed between the parties, unless specifically noted otherwise.

On November 11, 2016, Charlina O'Brien telephoned 911 to report that she had been involved in a physical altercation with her boyfriend, Mr. King. [Def. Exh. A]. During the 911 phone call, Ms. O'Brien requested the aid of an ambulance, stating that her nose was bleeding and that it may have been broken by Mr. King. [*Id.*]. She confirmed that she believed Mr. King was still at his residence in Fishers, Indiana, though she, herself, had relocated to a neighbor's home. [*Id.*]. The 911 operator dispatched Fishers Police Officer Kyle McFerran, who was on routine patrol at the time, to investigate Ms. O'Brien's claims. [*Id.*; McFerren Aff. ¶¶ 3-5].

When he arrived at Ms. O'Brien's location at the neighbor's house, Officer McFerran observed that she had multiple injuries, including a bloody nose, scratches on her chest and hands, a bloody toe on her left foot, and a bruise and scratch on her back. Officer McFerran also noted that Ms. O'Brien had dried blood on the side of her face, on her hand, and on her arm. [*Id.* ¶ 6, Exh. 1]. When Officer King asked Mr. O'Brien how her injuries were incurred, she explained that she had been arguing with Mr. King for several hours and that, during their argument, he struck her and "pushed her around the house." [*Id.* ¶ 7].

While Officer McFerren was speaking with Ms. O'Brien, Sgt. Troy Fettinger of the Fisher's Police Department arrived on the scene. Sgt. Fettinger also observed Ms. O'Brien's injuries, and she reiterated to him that Mr. King had caused them. [Fettinger Aff. ¶¶ 3-5]. Ms. O'Brien informed the officers that Mr. King remained in his home, that he had access to several firearms, and that he typically carries a gun on his person. [McFerran Aff. ¶ 8].

At this time, Officer McFerren and Sgt. Fettinger walked to Mr. King's nearby home. [Fettinger Aff. ¶ 6; McFerran Aff. ¶ 10]. Sgt. Fettinger went to the rear of the home while Officer McFerran approached the front. [Fettinger Aff. ¶ 7; McFerran Aff. ¶ 11]. Officer McFerran knocked on the  front door of Mr. King's home several times before Mr. King answered. [McFerran Aff. ¶ 12]. Officer McFerran reports that, as Mr. King opened the door, he stepped backward into his  home, blocking a clear view of his hands. [*Id.*]. This prompted Officer McFerren to order Mr. King to "show [] his hands and to exit the residence." [*Id.* ¶ 13]. According to Officer McFerran, rather that acquiesce to these demands, Mr. King invited Officer McFerran to enter his residence. [*Id.* ¶ 14]. Mr. King denies that he ever invited Officer McFerran inside.[3] [King Aff. 4, § 9]. Officer McFerran continued his verbal orders to Mr. King to exit the home, and when

---

[3] Defendants request that we strike this portion of Mr. King's affidavit declaring that he did not invite the officers in, asserting that it is inconsistent with his prior deposition testimony. Specifically, Mr. King testified at his deposition that he could not remember if the officers "asked if they could enter [his] home[.]" However, based on the evidence before us, Mr. King was not asked at his deposition if he *invited* the officers in, as Defendants now assert. Whether the officers requested permission to enter (and had that request granted) and whether Mr. King personally invited them in are not factually the same. We therefore disagree with Defendants that Mr. King's affidavit and deposition testimony are contradictory to an extent warranting that this portion of his affidavit be stricken.

he eventually complied, Officer McFerran handcuffed and *Mirandized* him. [McFerran Aff. ¶ 14].

Having determined that Mr. King had been apprehended in the front yard of the residence, Sgt. Fettinger joined Officer McFerran there and together they entered the residence to "secure the interior and confirm that no one else was inside." [*Id.* ¶¶ 8, 9; McFerran Aff. ¶ 16].

In the course of their inspection of the residence, Sgt. Fettinger discovered a door with a locked door knob, though, according to Sgt. Fettinger, the door was slightly ajar and easily opened when pushed. Sgt. Fettinger has stated that when he pushed the door open, he noticed that the door frame was slightly cracked and that the strike plate for the door lock was dismissing, rendering the lock useless. [Fettinger Aff. ¶¶ 14-16]. Mr. King is adamant, however,  that the lock was in working order and that the room was secured. [King Aff. 1,  § 1]. Sgt. Fettinger later advised Mr. King that the door to this room, which Mr. King regards as his "office," needed repair to ensure that it remained locked, which allegedly confused Mr. King since he believed the lock was secure. [Fettinger Aff. ¶ 7; King Aff. 1, § 5].

Once Officer McFerran had secured Mr. King's residence, he returned to speak with Ms. O'Brien, whose injuries were being treated by paramedics of the Fisher's Fire Department. [McFerran Aff, ¶¶ 22-23]. During this second conversation with Officer McFerran, Ms. O'Brien informed him that she had been living with and dating Mr. King for seven years. [*Id.* ¶ 24]. She also reported that Mr. King had that day pulled her off the toilet, slapped her, and dragged and pushed her.  [*Id.* ¶ 25]. She further told Sgt. Fettinger

that Mr. King had smacked her in the nose, pulled her around by her arm, and pushed her into walls and down on the floor. [Fettinger Aff. ¶ 27]. Both Officer McFerran and Sgt. McFerran observed that, during their conversations with her, Ms. O'Brien was "visibility upset." [McFerran Aff, ¶ 26; Fettinger Aff. ¶ 27].

Maria Rhea, a Fishers Fire Department paramedic who examined Ms. O'Brien at the scene, discovered that she had multiple bruises on her back and extremities as well as a contusion on her head. She also observed that Ms. O'Brien's fingers and toes were covered in blood and lacerations.  Ms. O'Brien informed Ms. Rhea that Mr. King was her boyfriend of six years and that she feared for her life. Ms. Rhea conveyed this information to the police officers, finished treating Ms. O'Brien's wounds, and departed the scene, following Ms. O'Brien's denial of the offer to transport her to the hospital. [Rhea Affidavit, ¶¶ 6-12].

Officer McFerran questioned Mr. King about the incident at the scene. Mr. King denied striking, punching, kicking, or otherwise physically harming Ms. O'Brien. He also claimed to have no knowledge as to how she received her injuries. [Fettinger Aff, McFerran Aff, ¶ 36]. Mr. King further advised Officer McFerran that this was not the first time that Ms. O'Brien had contacted the police to make false allegations against him. [*Id.* ¶ 37].

Mr. King was arrested and taken into custody on the charge of domestic battery and transported to Hamilton County Jail, where he remained for four days, until November 15, 2016. [Sec. Am. Comp. ¶ 137]. Officer McFerran and Sgt. Fettinger have

7

testified that they did not seize any items from Mr. King's residence on the day of his arrest. [Fettinger Aff. ¶ 39; McFerran Aff. ¶ 42].

Mr. King alleges that, upon his return home on November 15, 2016, he noticed that his "guns and safe including its contents such as knives and ammunition" were missing from his allegedly locked home office. [Sec. Am. Comp. ¶ 138]. Three days later, on November 18, 2016, he reported the missing items to the Fishers Police Department. [*Id.* ¶ 139]. That night, Fishers Police Officer Eric Freeman went to Mr. King's residence to investigate the theft. [Def. Br., at 2, 22]. However, Officer Freeman refused to discuss with Mr. King the circumstances of his arrest several nights earlier, though Mr. King pressed to have that investigation continue. Mr. King also believes that Officer Freeman was complicit in a coverup that had been initiated by Officer McFerran and Sgt. Fettinger to steal or conspire to steal Mr. King's property. [Pl. Aff. 4, § 6].

Officer McFerran and Sgt. Fettinger deny that at any time during their investigation or any time thereafter did they, or any other member of the Fishers Police Department, remove or otherwise facilitate the removal of personal property from Mr. King's home. [Fettinger Aff. ¶ 39; McFerran Aff. ¶ 42].

On April 28, 2017, Mr. King sent a letter to Chief of Police Mitchell S. Thompson outlining his grievances related to his arrest for domestic battery as well as the subsequent investigations regarding the alleged theft of property from his home. Chief Thompson informed him that, because his criminal case was pending at that time and because he had an attorney representing him in that case, all communications would

necessarily need to go through Mr. King's attorney. [Thompson Aff, ¶¶ 4-5, 7-8; King Aff §§ 12-13].

On June 1, 2017, following the dismissal of Mr. King's criminal charge, Assistant Chief of Police Edward Gebhart,[4] at the request of Chief Thompson, contacted Mr. King to discuss the matters contained in his letter to Chief Thompson. Mr. King requested that the Police Department admit that his arrest was unlawful, or, alternatively, issue a written explanation of "why it was standing behind its original position." Following a review of Mr. King's arrest record, Assistant Chief Gebhart explained to Mr. King that Sgt. Fettinger and Officer McFerran made their decision based on the information known to them at the time. [Gebhart Aff. ¶¶ 4-10; King Aff §§ 14-16].

Mr. King's second amended complaint, which is the operative pleading at this point, seeks to hold Sgt. Fettinger, Officer McFerran, Officer Freeman, Chief Thompson, and Assistant Chief Gebhart personally liable for various constitutional violations. Mr. King charges Sgt. Fettinger and Officer McFerran with three violations of the Fourth Amendment, specifically alleging that they conducted an unreasonable search of his home (Count I), that they wrongfully arrested him without probable cause (Count II), and that they failed to secure his property (Count III). He further alleges that Sgt. Fettinger, Officer McFerran, Chief Thompson, Assistant Chief Gebhart, and Officer Freeman violated his Fourteenth Amendment due process rights by failing to properly investigate

---

[4] Chief Thompson has since retired and Assistant Chief Gebhart promoted to Chief, though we refer to these individuals pursuant to the titles they held at the time.

the domestic battery charge (Count IV). Finally, Mr. King seeks to hold Fishers

accountable under a theory of *Monell* liability (Count V).

## Analysis

### I.    Standard of Review

Summary judgment is appropriate where there are no genuine disputes of material

fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A court must grant a motion for

summary judgment if it appears that no reasonable trier of fact could find in favor of the

nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). We neither weigh the evidence nor evaluate

the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences

flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*,

573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

Where the movants seek judgment on a claim on which the nonmovant bears the

burden of proof, as Defendants do here, the movants are entitled to judgment as a matter

of law if they can point to a failure of proof in the record such that no reasonable jury

could find in the nonmovant's favor on one or more elements of his claims. *Celotex*

*Corp.,* 477 U.S. at 322-23.

### II.    Discussion

Mr. King's constitutional claims are grounded in 42 U.S.C. § 1983, which imposes

liability on "[e]very person" who "subjects, or causes to be subjected" another to the

deprivation of federal rights under color of state law.

10

A. Fourth Amendment Claims

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. The touchstone of the Fourth Amendment is reasonableness under all the circumstances, *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006), limned by balancing the public and private interests at stake in a given state intrusion into personal privacy. *United States v. Hensley*, 469 U.S. 221, 228 (1985).

1. *Disputed Questions of Material Fact Preclude a Grant of Summary Judgment on Count I*

Mr. King's Fourth Amendment allegations against Officer McFerran and Sgt. Fettinger  are based on their unreasonable search of his home "without a legitimate investigative purpose." He lays out various specific grievances with respect to the officers' access to his office, which he asserts was locked at the time of their arrival and entry.

It is undisputed that the officers did not have a warrant to search Mr. King's home. Because government entry into one's home is the "chief evil against which the Fourth Amendment is directed," the law presumes that a warrantless search was unreasonable. *United States v. Sabo*, 724 F.3d 891, 893 (7th Cir. 2013) (*Payton v. New York,* 445 U.S. 573, 585 (1980)). There are, however, exceptions to this presumption.

One exception exists where an individual consents to a search. *United States v. Basinski*, 226 F.3d 829, 834 (7th Cir. 2000). Here, the officers maintain that Mr. King invited them inside his home, while Mr. King insists that he did not. We will not weigh or

attempt to resolve the credibility of these conflicting factual assertions at summary judgment.  It is not within the Court's purview to decide on summary judgment whether Mr. King consented to the search of his home.

The officers nonetheless assert that they are entitled to summary judgment on this claim based on the exigent circumstances exception to the warrant requirement. Because entry into and search of Mr. King's home was reasonable under the circumstances, so was their entry into his office.[5]

The exigent circumstances exception provides that "a warrantless entry into a dwelling may be lawful when there is a pressing need for the police to enter but no time for them to secure a warrant." *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 557 (7th Cir. 2014). Well-recognized exigencies include situations where someone inside the home is in imminent danger, where the occupant inside a residence is armed, or where a suspect has fled into a dwelling. *Id.* (collecting cases). In determining whether exigent circumstances exist, we look to "whether it was reasonable for the police officers on the scene to believe, in light of the circumstances they faced, that there was a compelling need to act and no time to obtain a warrant." *Id.*

The officers here do not cite to any of these exigencies. Instead, Officer McFerran and Sgt. Fettinger report entering Mr. King's home simply to confirm that no other

---

[5] The Defendants confusingly assert that they are entitled to summary judgment on Count I on the grounds that they had sufficient evidence to seize Mr. King at the time. However, Count I relates only to the search of his home, not the arrest of Mr. King. Moreover, it does not follow that their purported probable cause to arrest Mr. King would establish that the "search . . . of Mr. King's home was not unreasonable" even though they had no warrant.

12

individuals were inside. Neither officer claims to have actually believed that anyone else was inside. Nor do the officers articulate any facts that could give rise to such a belief. There is no evidence before us, for example, that Ms. O'Brien had communicated that someone else was inside the residence. She herself was outside, being cared for by paramedics, so there was no issue of needing to reach her to provide emergent care. Though she told officers that Mr. King had access to weapons inside, by the time the officers searched the home, Mr. King was outside and securely handcuffed.  Thus, there was no concern that he could or would access weapons located inside the house. So far as we are aware, Mr. King remained handcuffed and secured until he was transported to jail.

The cases cited by Defendants are inapposite. The Ninth Circuit in *United States v Brooks*, for example, held that officers may make a warrantless entry if they "reasonably believe that a person is in need of immediate aid." 367 F. 3d 1128 (9th Cir. 2004). There, officers were dispatched to a hotel following a guest's report that there were sounds of a "woman being beaten" coming from the room next door. *Id.* at 1130. Officers reported to the hotel and went to the room responsible for the noises. There, they were confronted with a man and a crying woman, prompting their entry into the hotel room. The Ninth Circuit upheld the constitutionality and reasonableness of this entry in light of the need for the officers  to confirm the physical safety of the woman. The Ninth Circuit nonetheless cautioned that this decision did "not suggest that domestic abuse cases create a *per se* exigent need for warrantless entry." *Id.* at 1137.

In our case, as we have stated, there is no indication that the officers believed that anyone inside of Mr. King's home was in need of "immediate aid." Indeed, the victim was

safe and secure outside and the alleged perpetrator had been apprehended. Accordingly,

*Brooks* provides no guidance here. For these same reasons, our decision in *Kirk v.*

*Gregory* as well as out of the District of Nebraska in *United State v Lawrence* are

unhelpful in terms of providing support to the officers' defense. No. 1:05-cv-1681-SEB-

TAB, at *10-11 (S.D. Ind. Sept. 28, 2007); 236 F. Supp. 2d 953, 961 (D. Neb. 2002).[6]

Accordingly, we deny Defendants' request for summary judgment on Count I.

2. *Officer McFerran and Sgt. Fettinger Possessed Probable Cause to Arrest Mr. King for Domestic Battery*

In analyzing the constitutionality of Fourth Amendment seizures, police-citizen

interactions are divided into three types. *United States v. Johnson*, 910 F.2d 1506, 1508

(7th Cir. 1990) (citing *United States v. Black*, 675 F.2d 129, 133 (7th Cir. 1982)). Under

this framework, progressively deeper intrusions into a citizen's privacy interests require

progressively weightier justifications. *See id.* Consensual encounters over which police

exercise no control, which are therefore not Fourth Amendment seizures at all, require no

particularized suspicion to justify them. *Id.* Investigatory stops, or *Terry* stops, which are

limited to brief, nonintrusive detentions require reasonable suspicion of criminality

supported by specific, articulable facts. *Id.* Full arrests subjecting an arrestee to a litany of

---

[6] Defendant's Reply brief also invokes the protective sweep exception to the warrant requirement as justification for searching Mr. King's office. As explained by the Seventh Circuit: "Under the protective sweep exception, officers may, incident to arrest and 'as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.'" *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 627 (7th Cir. 2008) (quoting *Maryland v. Buie*, 494 U.S. 325, 334 (1990). The protective sweep exception serves to protect "the safety of police officers, who have an interest in ensuring their safety when they lawfully enter a house." *Id.* Here, however, the question of the officers' lawful entry into Mr. King's house remains unanswered. Consequently, the protective sweep exception is inapt.

intrusions, *see Utah v. Streiff*, 136 S. Ct. 2056, 2070 (2016) (Sotomayor, J., dissenting), require probable cause to believe the person is committing or has recently committed a crime. *Johnson*, 910 F.2d at 1508.

There is no uncertainty here as to the type of police-citizen interaction between Mr. King and the Fishers' police officers. He had been formally arrested and taken into police custody. The requisite quantum of suspicion for arrests is probable cause, which Mr. King asserts the arresting officers did not have.

"Probable cause exists if at the time of the arrest, the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Ramos v. City of Chicago*, 716 F.3d 1013, 1018 (7th Cir. 2013) (*internal quotations omitted*). Determinations of probable cause are mixed questions of fact and law, but when the facts are undisputed, the ultimate resolution of whether probable cause or reasonable suspicion existed becomes a question of law. *United States v. Carlisle*, 614 F.3d 750, 754, 2010 WL 3155876 (7th Cir. 2010).

Here, it is undisputed that at the time Mr. King was arrested for the offense of domestic battery, the officers were proceeding on the basis of the following circumstances and information.

Ms. O'Brien had telephoned 911 to report that she had been assaulted by Mr. King and that she needed an ambulance to obtain needed medical treatment for her injuries. When Officer McFerran and Sgt. Fettinger arrived at Ms. O'Brien's location, they

observed that she was visibly wounded with multiple injuries, including a bloody nose (which Ms. O'Brien believed to be broken), blood on her hands and face, and scratches on her arms, chest, and back. She repeatedly informed the officers and the paramedic that Mr. King had assaulted her by striking and punching her, pushing her, and dragging her around the residence and caused these injuries. She further reported to paramedics—who following their examinations discovered additional injuries to Ms. O'Brien's person— that she feared for her life.

The officers questioned Mr. King, who denied causing Ms. O'Brien's injuries or knowing how she was injured. He also reported to the officers that Ms. O'Brien had previously lodged false reports to police that Mr. King had threatened her with a weapon.

Based on the totality of these circumstances, we have concluded that the officers reasonably believed Mr. King had committed the crime of domestic battery.[7] *Miller v. Whipker*, 2004 WL 1622212, at *13 (S.D. Ind. Mar. 31, 2004) (finding probable cause based on similar facts); *see also Lewis v. Hite*, 2014 WL 1921735, at *3 (S.D. Ind. May 14, 2014). We note by way of explanation for Mr. King, that our probable cause determination does not depend on the truth of the allegations against him. *Lewis*, 2014 WL 1921735, at *3.

Mr. King believes that the officers should not have believed Ms. O'Brien's story because of her "earlier false report," which he contends makes it "so very clear that she is

---

[7] Indiana law provides: "a person who knowingly or intentionally touches a family or household member in a rude, insolent, or angry manner . . . commits a domestic battery, a Class A misdemeanor." Ind. Code 35-42-2-1.3(a)(1).

a "false reporter."  Mr. King's communications to the officers that Ms. O'Brien had

previously made false accusations against Mr. King, however, did not negate their

contemporaneous, objective observations of her injuries coupled with her verbal reports

that Mr. King had caused them. Police officers, when determining if probable cause

exists to arrest, are well advised to conduct further investigation when there is

information that would lead a reasonable officer to be suspicious of the victim's story, but

the Seventh Circuit has nonetheless explained:

> Many putative defendants protest their innocence, and it is not the responsibility of
> law enforcement officials to test such claims once probable cause has been
> established. Consequently, the law does not require that a police officer conduct an
> incredibly detailed investigation at the probable cause stage. Accordingly, the
> inquiry is whether an officer has reasonable grounds on which to act, not whether
> it was reasonable to conduct further investigation.
>
> *Spiegel v. Cortese*, 196 F.3d 717, 724-25 (7th Cir.1999).

Based on the information provided to them, the officers in the case before us had

reasonable grounds to take Mr. King into custody and arrest him. Though Mr. King

communicated to the officers Ms. O'Brien's history of "false reporting," the officers were

not required to investigate that history at that moment nor to accept Mr. King's

protestations of innocence, given the obvious and serious injuries to and statements by

Ms. O'Brien. *Id.*  It is true that a history of "false reporting" may undermine Ms. O'Brien's

credibility as a witness, but this is "not a factor that makes [the officers'] reliance on her

account of the facts unreasonable for purposes of probable cause to arrest." *Miller*, 2004

WL 1622212, at *14. Accordingly, we are unpersuaded by Mr. King's claims that the

officers ignored this "exculpatory evidence" when they proceeded with his arrest.

Mr. King also cites various "inconsistencies" in Ms. O'Brien's statements made to police that day which, he contends,  exhibited "extreme signs of lying."  These alleged inconsistencies related to Ms. O'Brien initially attributing her nose injury to Mr. King punching or smacking her, while later claiming that he pushed her into the wall. The officers sought clarification as to what happened as they continued with their interview of her. Any such inconsistency does not undermine our conclusion that the officers had probable cause to arrest Mr. King.

Importantly, the Seventh Circuit does not mandate that a putative victim provide a flawless account of events. *Miller*, 2004 WL 1622212, at *13; (citing *Spiegel v. Cortese*, 196 F.3d 717 (7th Cir.1999), cert. denied, 530 U.S. 1243 (2000). In *Spiegel*, the Seventh Circuit explained:

> Nothing suggests that a victim's report must be unfailingly consistent to provide probable cause. The credibility of the putative victim or witness is a question, not for police officers in the discharge of their considerable duties, but for the jury in a criminal trial. We refuse to require law enforcement officers to delay arresting a suspect until after they have conclusively resolved each and every inconsistency or contradiction in a victim's account.

> *Spiegel*, 196 F.3d at 724-25.

Accordingly, we hold that the officers were not unreasonable in their assessment of probable cause, even in light of this or any such inconsistency.

"[O]nce probable cause has been established, officials have 'no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence.'" *Miller*, 2004 WL 1622212, at *14 (quoting *Eversole v. Steele*, 59 F.3d 710, 718 (7th Cir. 1995). While "[t]he continuation of even a lawful arrest violates

the Fourth Amendment when the police discover additional facts dissipating their earlier probable cause," Mr. King has not identified any concrete facts that undermine the officers' probable cause to arrest him. *Id. (quoting BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir.1986).

For these reasons, summary judgment shall be entered for Defendants on Count II.

3. *There Is No Evidence That Officer McFerran or Sgt. Fettinger Stole Mr. King's Guns and Safe*

Count III of Mr. King's complaint alleges that Officer McFerran and Sgt. Fettinger violated the Fourth Amendment by seizing Mr. King's guns and safe or, alternatively, by "fail[ing] to reasonably secure" Mr. King's property resulting in the loss of Mr. King's property, even if these officers were not the one's to commit the actual theft.

We begin by noting that there is simply no evidence that Officer McFerran and Sgt. Fettinger seized (or, as Mr. King puts it, "stole") any personal property belonging to Mr. King. Both officers have testified that they did not confiscate these items, either on the day of Mr. King's arrest or any day thereafter. In response, Mr. King runs through a convoluted thought process in the nature of a "process of elimination" which has led him to believe that the Fishers police officers were the most likely thieves. He opines that they there were "capable of removing a heavy safe" and that the time they spent responding to Ms. O'Brien's 911 call was actually a ploy to stake out Mr. King's home so they could subsequently break into his office so that they (or other Fishers personnel) could return

and remove the safe. Thus, he argues, they must have been "working as a deceptive team" to steal his safe or to allow others to steal his safe.[8]

This trail of conjecture and speculation does not create any questions of fact relating to whether the officers seized Mr. King's property. *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 726 (7th Cir. 2004). Mr. King has identified no specific facts or evidence supporting his claim; it is the product entirely of his own personal speculations. Such an unfounded theory is insufficient to overcome Defendants' motion for summary judgment, which, accordingly, we will grant in the officers' favor on this issue. *Carmody v. Bd. of Trustees of Univ. of Illinois*, 893 F.3d 397, 401 (7th Cir. 2018) ("[I]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.")

We turn next to Mr. King's claim that the officers failed to secure his home, thereby exposing his property to a risk of theft by others. This claim sounds in Fourteenth Amendment Procedural Due Process, rather than in Fourth Amendment reasonableness standards, but because Mr. King is proceeding *pro se*, we will construe his claim liberally and proceed to analyze it as if it had been properly alleged under the Fourteenth Amendment.

---

[8] Indeed, we note that large portions of Mr. King's complaint and briefing are dedicated to theorizing about how the Fishers Police Department engaged in a series of misdeeds aimed at unlawfully arresting him so that officers could invade his home and facilitate the removal of his guns and, ultimately, engage in coordinated acts of deception to cover up this misconduct. No lengthy review of these allegations is required when there is simply no evidentiary support for Mr. King's imaginative theories.

The Fourteenth Amendment's procedural due process clause forbids states from depriving anyone of life, liberty, or property without due process of law. To prevail on a claim for procedural due process under the Fourteenth Amendment, a plaintiff must establish: (1) a protected property interest; (2) a deprivation of that property interest by an individual acting under the color of state law; and (3) a denial of due process. *Booker–El v. Superintendent, Ind. State Prison*, 668 F.3d 896, 900 (7th Cir.2012).

Assuming *arguendo*, as Defendants do, that Mr. King could present facts satisfying the first two elements, we turn to Defendants' argument that there was nonetheless no due process violation here because Indiana law provides an adequate remedy for any of Mr. King's losses.

State officials' unauthorized negligent or intentional deprivations of property do not violate due process so long as a state provides an adequate post-deprivation remedy for the law. *Wynn v. Southward*, 251 F.3d 588, 592, 2001 WL 564020 (7th Cir. 2001) (collecting cases). The Seventh Circuit has recognized that the Indiana Tort Claims act, which provides for state judicial review of property losses caused by state officials, provides such an adequate post-deprivation remedy. *Id.*

Defendants are thus correct in their argument that there is no remedy for Mr. King's Fourteenth Amendment claim against Officer McFerran and Sgt. Fettinger; to the extent Mr. King believes the officers caused the loss of his property, his remedy arises under the Indiana Tort Claims Act, not a civil rights claim. *Id.*; *see also Stork v. McKinley*, 444 Fed. Appx. 920, 922, 2011 WL 5024160, at *1 (7th Cir. 2011) (reiterating that unauthorized deprivations of property could not violate one's due process right

because Indiana Tort Claims Act provided adequate remedy); *Wilson v. Civil Town of Clayton, Ind.,* 839 F.2d 375, 383, 1988 WL 8016 (7th Cir. 1988) (upholding court's dismissal of due process claims against officers in their personal and official capacities because Indiana Tort Claims Act provided adequate remedy); *Johnson v. Wilson*, 2008 WL 360890, at *2 (S.D. Ind. Feb. 8, 2008) (granting summary judgment to officers for due process claim because Indiana Tort Claims Act provided adequate remedy).

Summary judgment shall therefore enter in favor of Defendants on Count III.

B. <u>Defendants are Entitled to Summary Judgment, In Part, on Count IV</u>

The precise nature of Count IV is difficult to decipher from Mr. King's complaint and briefing.

He reiterates in part his earlier claims against Sgt. Fettinger and Officer McFerran that he was wrongfully arrested and deprived of his property. As previously noted, these allegations fall within the scope of Mr. King's Fourth and Fourteenth Amendment claims against the officers, which we have already addressed and resolved.

Mr. King has alleged that Chief Thompson, Assistant Chief Gebhart, and Officer Freeman "deliberately fail[ed] to correct the wrongful actions" of Sgt. Fettinger and Officer McFerran. In this claim, Mr. King appears to believe that these officers, following his arrest, should have continued to investigate whether there had been probable cause to arrest and ultimately that they should have admitted that Mr. King had been wrongfully arrested.  This allegation underlies his claim of malicious prosecution against all of the officers.

We begin by addressing Mr. King's claims that Chief Thompson, Assistant Chief Gebhart, and Officer Freeman violated his Fourteenth Amendment Due Process Rights by failing to properly "reinvestigate" the facts giving rise to his arrest.

Defendants have construed Mr. King as alleging a class-of-one equal protection claim, that is, a claim for discrimination regardless of one's membership in a protected class. *Engquist v. Oregon Dep't of Agr.,* 553 U.S. 591 (2008). In response, Mr. King contends that Defendants have incorrectly interpreted his complaint as alleging a violation of the Fourteenth Amendment's Equal Protection Clause.

Defendants' Equal Protection Claim extrapolated from Plaintiffs' complaint is also difficult to understand. Though we concede that Mr. King's complaint is far from a model of clarity, it does not present any claims of discrimination. Mr. King's claim appears to be that these officers violated his due process rights by refusing to reinvestigate his arrest and remedy this purported wrong. While we doubt that the Fourteenth Amendment affords such a right to "reinvestigation" following one's arrest and that these officers (as opposed to the prosecutors) had any authority to remedy an allegedly wrongful arrest, Defendants have not advanced a thoughtful legal argument to this effect.[9]  The Court will not craft Defendants' arguments for them. Accordingly, we deny the motion for summary judgment on this claim.

---

[9] This theory receives only passing reference in Defendants' reply brief. Defendants also have invoked a misguided argument that Officer Freeman cannot be held liable because he does not have policy-making authority. Such a requirement, however, is irrelevant where an officer is sued in his individual (rather than official) capacity. *See Estate of Sims ex rel. Sims v. Cty. of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007)

Turning to Mr. King's Fourteenth Amendment claim for malicious prosecution, Defendants argue that this claim does not survive because state law provides an adequate remedy. This is incorrect, as evident from the fact that the case on which Defendants have relied is no longer good law. *See Newsome v. McCabe*, 256 F.3d 747, 749 (7th Cir. 2001), *abrogated by Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911 (2017). The Seventh Circuit has explicitly recognized "that Indiana state law does *not* provide an adequate remedy for malicious prosecution." *Serino v. Hensley*, 735 F.3d 588, 593 (7th Cir. 2013) (*emphasis in original*) (citing *Julian v. Hanna*, 732 F.3d 842 (7th Cir.2013)).

Lacking any discussion of the correct standard of review for malicious prosecution claims brought pursuant to section 1983, as set out in *Serino* and *Julian*, we deny the request for summary judgment on this issue.

## C. Defendants are Entitled to Summary Judgment on Count V

For each constitutional violation alleged, Mr. King seeks to hold Fishers accountable under a theory of *Monell* liability.

It is well-settled that § 1983 does not allow "for a local government to be sued . . . for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690 (1978); *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 468 (7th Cir. 2001). To successfully maintain a § 1983 action against a local government, a plaintiff must demonstrate the existence of an unconstitutional policy. "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality."

24

*Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 403–04 (1997). Such a policy can take one of three forms: "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) an allegation that constitutional injury was caused by a person with final policy-making authority." *Rasche v. Vill. of Beecher*, 336 F.3d 588, 597 (7th Cir. 2003). Additionally, in certain circumstances, a municipality may be liable for constitutional violations resulting from its failure to properly train its officers. *City of Canton v. Harris*, 489 U.S. 378 (1989).

We agree with Defendants that, to the extent the acts outlined in Count I or Count IV were constitutionally unsound, there is no evidence that these were anything but isolated incidents, which is insufficient for a *Monell* claim to survive. *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (internal quotations omitted); ("[T]here is no clear consensus as to how frequently such conduct must occur to impose Monell liability, except that it must be more than one instance . . or even three."); *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) (finding that isolated incidents do not implicate a widespread implicit policy); *Petropoulos v. City of Chicago*, 448 F. Supp. 3d 835, 840 (N.D. Ill. 2020) ("Both in the 'widespread practice' implicit policy cases and in the cases attacking gaps in express policies, what is needed is evidence that there is a true municipal policy at issue, not a random event.").

Mr. King again theorizes that the Fishers police officers acted in such a coordinated, deceptive manner that they must have been working together pursuant to a

widespread custom or practice. We emphasize, however, that Mr. King's speculations are not evidence, and there is simply no evidence to establish that, to the extent he may have been harmed, this harm was anything other than an isolated, random occurrence. Mr. King invites the Court to treat these assertions as "circumstantial evidence" of other instances of misconduct; however, no legal authorities permit that approach, especially when the "circumstantial evidence" is nothing more than Mr. King's unsubstantiated theories.

We thus grant Defendants' request for summary judgment on Count V.

### III.  Defendants are Not Entitled to Rule 11 Sanctions

Imbedded in Defendants' Reply brief is a request for sanctions pursuant to Federal Rule of Civil Procedure 11, on the grounds that Mr. King's Response brief contains frivolous, groundless accusations. As the Magistrate Judge has previously informed both parties, Rule 11(c)(2) as well as our Local Rule 7-1(g) require a "warning shot" to be given to adversaries prior to moving for sanctions. This places the adversary on notice and provides them an opportunity to remedy the alleged misconduct. Defendants have not indicated that they provided any "warning shot" to Mr. King. The request for sanctions is, therefore, denied.

### <u>CONCLUSION</u>

Defendants' Motion for Summary Judgment [Dkt. 47] is **granted in part and denied in part.** The motion is **denied** with respect to Count I. It is also **denied** with respect to Count IV to the extent Mr. King alleges malicious prosecution and a failure to "reinvestigate." Summary judgment is **granted** to Defendants on Count II, III, and V, as

well as on the portions of Count IV repeating the allegations set out in Count II and III, namely, the claims for wrongful arrest and seizure of Mr. King's property. Defendants' request for sanctions is **denied.**

IT IS SO ORDERED.

Date: _____9/30/2020_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

JONATHAN D. KING
9898 River Oak LN W
Fishers, IN 46038

David A. Izzo
SELECTIVE STAFF COUNSEL OF INDIANA
david.izzo@selective.com